IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JACQUELYN MCDANIEL,

    PLAINTIFF,

v.                                          CASE NO.: CV-01-J-325-NE

ERC, INC.,

    DEFENDANT.

## MEMORANDUM OPINION

This cause comes before the court on the defendant's motion for summary judgment (doc. 18) and evidence in support of said motion.[1] The plaintiff failed to respond to said motion in a timely manner.[2] However, this court has considered all of the evidence and pleadings before it in the light most favorable to the plaintiff, as required by Rule 56, Fed.R.Civ.Pro. The plaintiff brought suit under Title VII, 42 U.S.C. § 2000e, *et seq,* for retaliation after she complained of sexual harassment by her supervisor.[3] The plaintiff also asserts that she was constructively discharged.

---

[1] The court having considered the defendant's request for oral argument, and finding that it will not substantially assist the court, the court **DENIES** said request.

[2] After this opinion was written and awaiting the undersigned judge's signature, the court received plaintiff's motion to allow an out of time response to defendant's motion for summary judgment (doc. 22), plaintiff's motion for continuance of trial proceedings (doc. 21), plaintiff's response to defendant's motion for summary judgment (doc. 23) and plaintiff's evidentiary submissions (doc. 24). The court, having reviewed the plaintiff's evidentiary submissions, finds this evidence would not have changed the outcome of this court's opinion as the majority of the submissions were already before the court.

[3] *See* plaintiff depo. at 335-336. For purposes of this motion, the court assumes that the plaintiff's allegation that she was sexually harassed by Glenn Campbell is true. In fact, the defendant removed Campbell from its premises upon the plaintiff's

30

## Factual Background

The plaintiff worked for defendant as an associate accountant from September, 1992 until she resigned on September 5, 2000. Amended complaint at ¶ 6. On August 3 or 4, 1999, the plaintiff reported to Susan Wu, president and CEO of defendant, that she was being harassed. Amended complaint at ¶ 7; plaintiff depo. at 201-204; exhibit 14 to plaintiff depo. The plaintiff alleges that after she made this report, her co-workers and supervisors made her working conditions so intolerable she was forced to resign in September, 2000.

The plaintiff states that co-employees Karma Haynes, Stephanie Fitch and Leigh Lossett caused problems for her. Plaintiff depo. at 108-109. The plaintiff attributes this to her report to her supervisor, accounting manager Randy Grizzard, that these three individuals were claiming they worked more hours than they actually did. *Id.* at 111-112. *See* Grizzard depo. at 9-11. This occurred in 1999, but the plaintiff was unsure as to what month. Plaintiff depo. at 112-113. The plaintiff had similar allegations made against her in March or April, 2000, which she states were unfounded. Plaintiff depo. at 120-121, 214-215. The plaintiff states this allegation hurt her feelings because no one asked her about it. *Id.* at 259-260.

---

complaint, and he resigned his position soon thereafter. *See* Ernest Wu depo. at 32-33. *See also*, Complaint at ¶ 7; affidavit of Hsu (defendant exhibit H) at ¶¶ 4-5; plaintiff depo. at 205-206; and September 7, 1999 memorandum from Susan Wu to plaintiff, submitted as part of exhibit 30 to plaintiff depo.

The plaintiff states Fitch and Haynes both called her names, were generally rude to her, and did not invite her to lunch.[4] Plaintiff depo. at 124-125, 130-132, 140-142, 156, 163-164, 166-167. She reported the rude comments to Grizzard, Campbell (before he left) and Kenneth Lyles (Campbell's replacement).[5] *Id.* at 126-127. At least one lunch incident and some of the comments were prior to her allegations of sexual harassment. *Id.* at 132, 139, 142. The plaintiff describes the problems with Fitch and Haynes as ongoing from July, 1998 until she left. *Id.* at 165-166.

The plaintiff complained in August, 1999 that her July, 1999 evaluation was not fair and she wanted it redone. Plaintiff depo. at 205, 270-271. In that evaluation, the overall rating was "needs improvement." Exhibit 1 to Grizzard depo. She received another evaluation in November, 1999. Exhibit 19 to plaintiff depo. That evaluation was subsequently redone in December, 1999, by Dr. Hsu, who lowered it.[6] Plaintiff depo. at 208-209, 271-273; *see* exhibit 20 to plaintiff depo. The plaintiff has no evidence Hsu took this action because of her sexual harassment complaint, but rather this was "just my belief." Plaintiff depo. at 209. She believes Hsu reevaluated her

---

[4]The plaintiff was invited to lunch by Fitch on August 11, 2000. *See* exhibit 30 to plaintiff depo.

[5]Plaintiff's deposition testimony makes it clear that her problems with Haynes began before she complained about Campbell. Plaintiff depo. at 309-311.

[6]Dr. Chun ("John") Hsu was Vice President General Manager in July, 1999. Hsu affidavit at ¶ 2. The plaintiff complains Hsu's evaluation was unfair because it was based on the temporary employee who filled in for her during November, 1999, doing her job better than she did it while using less overtime. Plaintiff depo. at 270, 273-276; *see* E. Wu depo. at 40-41, 51-52; Grizzard depo. at 50-52.

due to her complaint of harassment because he did not see her work on a daily basis. *Id.* at 269-270. She also contends her June, 1999 raise was less than it should have been because of her complaint.[7] *Id.* at 209-210. One of the raises she complains about was in June, 1999, before she made her sexual harassment allegation. *Id.* at 210. Upon her reevaluation in December, 1999, her November, 1999 raise was taken away, and she did not receive a Christmas bonus for December, 1999.[8] *Id.* at 210-211, 268.

The plaintiff asserts a make-up bag she kept in the ladies' room was vandalized, perfume and medicine were removed from her office, rude notes were left on her food in the refrigerator, and her soft drinks were superglued shut, all in retaliation for her complaint of sexual harassment. Plaintiff depo. at 211-212, 241-244. She states "I guess I felt that it was my fault because everyone was mad at me that [Campbell] was gone. These things started happening." *Id.* at 212. She also alleges she was not told about meetings being canceled; that she was given additional responsibilities;[9] she was accused of not doing her job; travel policies were changed without her knowledge; and that her assistant was taken away. *Id.* at 212-213, 247, 249-250. Further, Dr. Hsu did

---

[7] June, 1999 was before the plaintiff complained of harassment.

[8] The plaintiff was given a full month of paid leave she had not earned in November, 1999 due to her child being injured. Plaintiff depo. at 269, 383-384; exhibit 22 to plaintiff depo.

[9] The plaintiff also complains that her responsibilities for travel were taken away from her and given to Fitch. Plaintiff depo. at 245-246.

not say good morning to her and scrutinized her. *Id.* at 213-214, 216. Lyles did not make small talk with her. *Id.* at 247-248. She got less help from her coworkers and her own supervisor, Grizzard, did not stand up for her. *Id.* at 215, 253-254. The plaintiff testified "I was trying to be made so miserable I would leave." *Id.* at 218.

Concerning the incident with her make-up bag, the plaintiff's supervisor tried to find out who damaged it. Plaintiff depo. at 220. Likewise, she reported the soft drink and food incident, and again Grizzard tried to find out who vandalized them.[10] *Id.* at 220-222; exhibit 21 to plaintiff depo.

As to not being told meetings were canceled in March, April and May 2000, the plaintiff states this shows Lyles "left [her] out of the loop." Plaintiff depo. at 225. Plaintiff explained that, although Lyles replaced Campbell, "he was told one side of the story and I don't know if he was told the story in a way that made him feel this or whatever or if he just decided this on his own. But it was his mission to make me so miserable that I would leave once he got there." *Id.* at 225-226.

Although Lyles replaced Campbell after Campbell's resignation, the plaintiff states he "just looked at me like he couldn't stand to look at me." Plaintiff depo. at 233, 253. She attributes this to her complaint of harassment because she does not know why he would treat her this way. *Id.* at 233. He also told her she needed to get

---

[10]In response to the food tampering, a note was placed on the refrigerator telling employees to respect each other's food and drink. Exhibit 12 to plaintiff's depo.

5

her work done without using so much overtime and would make her redo reports he considered unacceptable. *Id.* at 236-237, 267-268. The plaintiff explains that all of this was related to her complaint of harassment because she had not been treated like this before.[11] *Id.* at 239.

The plaintiff also believes that the temporary employee who helped in several areas, including payroll, was "let go" and her position not filled to make the plaintiff's job more difficult, based on her "general feeling" about this.[12] Plaintiff depo. 253. She also faults Grizzard for not speaking to Haynes' supervisor about Haynes' refusal to work with plaintiff, but does not know that Grizzard did not do so. *Id.* at 255. The plaintiff thinks Grizzard did speak to Lyles about this and Lyles told everyone they had to be nice to each other. *Id.* at 256-257.

The plaintiff reported medication missing from her desk on the same date another employee reported a similar incident. E. Wu depo. at 53. As a result, most of the office staff was taken to be drug tested that same day. Plaintiff depo. at 343-345, 347. The plaintiff attributes the missing prescription to her complaint of sexual harassment. *Id.* at 346. The plaintiff resigned before the results of the drug testing

---

[11] As to the reports being unacceptable, the plaintiff believed this was related to her complaint of harassment because Lyles is not "the kind of man that really worries about little things like that – unless he's – has a reason." Plaintiff depo. at 268. She also stated that her co-employees were allowed to work overtime but when she asked to do so, Lyles said why couldn't she do her job. *Id.* at 366.

[12] According to Lyles, the plaintiff never had an assistant. Rather, the defendant hired temporary employees to assist in certain areas as needed. Lyles depo. at 9.

6

were received, but hers was the only test to be positive. *Id.* at 349; E. Wu depo. at 54.

When the plaintiff handed her resignation to Grizzard on September 5, 2000, he asked her if she wanted to think it over, and she declined. Plaintiff depo. at 353-354. *See* exhibit 24 to plaintiff depo. In her June, 2000 amended EEOC charge, the plaintiff states the retaliation against her began in December, 1999 and continued until May 31, 2000. *See* exhibit 11 to plaintiff's depo.

### Standard for Evaluating Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Supreme Court has explained:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates

the absence of genuine issues of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, Fed.R.Civ.Pro. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587.

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case .... A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir.2000), quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir.1995).

## Legal Analysis

The plaintiff alleges she was constructively discharged in September, 2000 in retaliation for her complaints of sexual harassment. The court has considered each of the incidents the plaintiff claims made her work environment so intolerable that she was forced to resign slightly more than a year after her complaint of harassment. To make out a prima facie case for retaliation, the plaintiff must show: 1) she engaged in

protected activity; 2) she was subject to an adverse employment action; and 3) the adverse action was causally related to her protected activity. *Johnson v. Booker T. Washington Broadcasting Serv. Inc.,* 234 F.3d 501, 507 (11th Cir.2000); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir.2000).

The defendant concedes that the plaintiff's complaint of harassment to Susan Wu in August, 1999 constitutes protected activity for purposes of this analysis. Defendant memorandum at 14, n. 7. Thus, this court turns to the question of whether the plaintiff was subjected to an adverse employment action.

Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action. *Wideman v. Walmart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998).

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir.1997). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998).

*Gupta,* 212 F.3d at 587. *See also Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir.2001) citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-61, 118 S.Ct. 2257, 2268, 141 L.Ed.633 (1998).

Title VII is neither a general civility code nor a statute making actionable the "ordinary tribulations of the workplace." *Gupta*, 212 F.3d at 587, citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999). Thus, Title VII has no requirement that employees and supervisors have to be nice to each other. The Court in *Davis* declared that:

> to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances (emphasis in original).

*Davis*, 245 F.3d at 1239 (citation omitted).

Here, the majority of the plaintiff's complaints center around co-employees and superiors just not being nice to her. The failure to say good morning, the failure to make small talk, and notifying an employee that work is unacceptable do not, alone or in combination, rise to the level of adverse employment actions. *See Gupta*, 212 F.3d at 588 ("None of those actions were "objectively serious and tangible enough" to alter [the] "compensation, terms, conditions, or privileges of employment, deprive ... her of employment opportunities or adversely affects ... her status as an employee").

The only possible material change in the plaintiff's employment was her November, 1999 re-evaluation by Grizzard being changed by Hsu in December, 1999. The November re-evaluation was at the plaintiff's request. The December re-

evaluation by Hsu resulted from the plaintiff being granted a month long paid leave, during which time a temporary employee performed her job more deftly than the plaintiff. A negative evaluation, in response to a well-documented job performance deficiency, does not rise to the level of such intolerable conditions that no reasonable person would remain on the job. *See Pipkins*, 267 F.3d at 1201[13]

The plaintiff here received raises in June, 1999 and June, 2000, despite poor performance evaluations. While the plaintiff did lose her November, 1999 raise due to her re-evaluation in December, 1999, she had already received a raise pursuant to her evaluation in June, 1999. Exhibit 30 to plaintiff depo. As such, the court fails to find any adverse employment action.

Even if the court considered the performance evaluations to be an adverse employment action, they fail to supply the requisite nexus for the plaintiff to make out a prima facie case of retaliation. The first evaluation she complains of is dated in June, 1999, more than a month before she complained of harassment. This cannot support the plaintiff's claim of constructive discharge in retaliation for her protected activity. An event prior to the protected activity in question cannot form the basis of

---

[13]In *Pipkins*, the court stated: "As for [the] continuing negative evaluations, they were in response to well-documented job performance deficiencies. Although [the plaintiff] asserts a claim of constructive discharge, her working conditions were not "so difficult"... that a reasonable person would have felt compelled to resign." *Hill v. Winn-Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991)(quoting *Wardwell v. Sch. Bd. of Palm Beach County*, 786 F.2d 1554, 1557 (11th Cir.1986)). Repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job. *Pipkins*, 267 F.3d at 1201.

a causal connection between protected activity and a later occurring adverse action. *See e.g. Pipkins*, 267 F.3d at 1201. *See also Griffin v. GTE,* 182 F.3d 1279 (11th Cir.1999).

The court also notes that even if it found that the plaintiff established her prima facie case of retaliation, the defendant has met its burden to rebut the presumption of retaliation. *See e.g., Johnson*, 234 F.3d at 507, n.6. The defendant has supplied nondiscriminatory reasons for the plaintiff's poor evaluations. The plaintiff has offered no evidence to rebut these allegations, other than her belief that the temporary employee may not have performed all of her job functions.

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons .... Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. *See Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) .... We have recognized previously and we reiterate today that [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991).

*Chapman v. AI Transport,* 229 F.3d 1012, 1030-1031 (11th Cir.2000). In response to the defendant's assertion that the plaintiff received a poor evaluation because she was doing poor work, the plaintiff states only that she disagrees. The plaintiff had the duty

to come forward with evidence that her December, 1999 re-evaluation, and her complaints that her co-workers were unfriendly, were intended to cause her to resign by making her working conditions intolerable. The plaintiff's mere allegation that she believed each incident to be related to her complaint of sexual harassment is insufficient to meet this burden.

## Conclusion

The court having considered the foregoing, and finding that the plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial on her claims under federal law, the court **ORDERS** that the defendant's motion for summary is hereby **GRANTED**. This case is **DISMISSED WITH PREJUDICE**. Each party is to bear its own costs.

**DONE** and **ORDERED** this the \_\_\_6\_\_ day of March, 2002.

                                                  INGE P. JOHNSON
                                                  UNITED STATES DISTRICT JUDGE